STATE OF CONNECTICUT *v.* DONALD MOODY
(AC 23471)

Lavery, C. J., and Schaller and West, Js.

Argued February 13—officially released June 3, 2003

*Jeremiah Donovan*, special public defender, with whom, on the brief, was *Rita Christopher*, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Donald Moody, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a)[1] and assault in the first degree in violation of General Statutes § 53a-59 (a) (5).[2] The defendant claims that (1) the trial court improperly refused to admit into evidence the full transcript of a defense witness' statement to police, (2) the prosecutor committed misconduct during cross-examination and closing argument in violation of the defendant's right to a fair trial and (3) the court failed to investigate adequately whether jurors saw certain notes made by the prosecutor that inadvertently had been given to an alternate juror. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 9, 1994, the victims, Marquis Clark and Frank Doughty, were walking with a third person near the intersection of George Street and Day Street in New Haven. The defendant was behind the steering wheel of a car stopped at the traffic signal on Day Street. As the victims walked along the sidewalk on Day Street, they and the defendant began shouting at each other. They had just walked past the rear of the defendant's car when the defendant aimed a handgun over his shoulder and fired eight to ten shots at them

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

through the car's rear windshield. Doughty was shot in the thigh, but survived. Clark was shot in the hand and chest, and died of injuries to his heart and left lung. The third person walking with the victims returned the defendant's gunfire, striking the defendant in the left leg. Additional facts are set forth as necessary for resolution of the defendant's claims.

I

The defendant first claims that the court improperly refused to admit into evidence the full transcript of a defense witness' statement to the police. We are not persuaded.

The following additional facts underlie the defendant's claim. The defendant's theory of defense at trial was that he had acted in self-defense when he shot Clark and Doughty. He called Larry Smith as a witness. Smith testified to the following facts. On the morning of November 9, 1994, the defendant and Smith were at the house where the defendant lived with his mother. Around lunchtime, the defendant left the house. When he returned, he appeared upset and stated that he had been approached, threatened and "ruffled up" by somebody at a convenience store on Sylvan Avenue. The defendant asked Smith to return to the store with him. When they arrived at the store, the individuals who earlier had approached the defendant no longer were there. The defendant purchased some food while Smith waited in the car. When the defendant returned to the car, Smith told the defendant that he wanted to go home.

The defendant drove in the direction of Smith's home, which was located near the corner of George and Day Streets. When the defendant stopped the car near that intersection, Smith opened the passenger side door part way to exit the vehicle. He saw a man standing on the corner pull a gun out of his coat pocket. While Smith was still seated in the passenger seat, the man began

firing the gun. After seeing the man fire the first shot, Smith ducked down behind the dashboard and heard what he described as "a rain of shots." At some point during the shooting, Smith caught a glimpse of the defendant holding a gun. The defendant, however, returned fire only after receiving a gunshot wound in his leg. The entire incident, from the time the first shot was fired, lasted approximately fifteen seconds.

After the shooting had ended, the defendant drove himself and Smith to the defendant's house. On the way there, Smith saw an automatic weapon in the defendant's lap, but testified that he did not know what happened to the gun after that point. When they arrived at the defendant's home, Smith helped the defendant out of the car and into the house. Smith then drove off in the car, accompanied by a person known to him only as "Anklehead." Smith and Anklehead eventually were stopped by the police and taken into custody. Smith was taken to a police station, where he made a tape-recorded statement.

During cross-examination, the state repeatedly questioned Smith about certain inconsistencies between his testimony and his November 9, 1994 tape-recorded police interview. Smith admitted that he had told the police that he did not know the defendant's first name and admitted that he had lied when he said that. Smith also admitted that he had not told the police that the reason he and the defendant were near the intersection of George and Day Streets was that the defendant was driving Smith home. In addition, Smith admitted that he told police that he had left the defendant's gun in the car upon arriving at the defendant's house, contrary to his trial testimony that he did not know what happened to the gun.

Prior to beginning redirect examination of Smith, the defendant filed a motion in limine seeking to introduce

the full twelve page transcript of the interview (police statement). In support of his motion, the defendant made two arguments. He argued that admission of the police statement was necessary to counter the state's implication that Smith recently had fabricated his testimony. In addition, the defendant argued that the police statement should have been admitted for purposes of rehabilitation, to place the apparent inconsistencies with Smith's trial testimony in context so as not to mislead the jury.

The court denied the motion to introduce the full police statement, but stated that it would permit the defendant to introduce certain sections. With regard to the defendant's argument that admission of the full police statement was necessary to counter an implication that Smith recently had fabricated his testimony, the court concluded that there was "no evidence of recent fabrication either explicit or implicit based on the examination [by the state]." The court also rejected the defendant's argument that the full police statement was necessary to place Smith's inconsistencies in context. The court ruled, however, that certain sections of the police statement were admissible for that purpose. Specifically, the court ruled that it would permit the defendant to introduce the section of the police statement relating to Smith's knowledge of the defendant's name as well as two sections in which Smith answered questions regarding the gun used by the defendant.[3]

[3] The court permitted the defendant to introduce the following passages from the transcript of Smith's statement to the police:

"[New Haven police department Detective Gilbert Burton]: Larry, is it not a fact that you're in the New Haven Police Department on this date, that being 11/9/94, giving information concerning a shooting that you have information on?

"[Larry Smith]: Yes.

"Q. And can you name the persons if you can that was involved in this shooting?

"A. That was involved? I don't know the people that was on the corner. I don't know their names.

"Q. But do you know anyone involved in the shooting?

The court specifically stated that those sections of the police statement would be admitted if offered by the defendant.[4] Despite the court's ruling that the three

"A. Yeah.

"Q. What's the person's name that you know?

"A. Moody.

"Q. You said Moody?

"A. Yeah.

"Q. Do you know him by any other name, his first name or street name?

"A. Nah, Moody.

"Q. And can you tell me where this shooting took place?

"A. On Day and George.

\* \* \*

"Q. You never touched a gun, is that correct?

"A. Huh?

"Q. Do you ever touch a gun?

"A. No, I didn't touch it 'till we got to the house.

"Q. And what do you do with it after you get to the house?

"A. That's it. I help him in the house cause he's shot.

"Q. No, no, no. The gun we're talking about. What do you do with the gun after you get to the house, or do you touch the gun before the shooting started?

"A. No. After we get to the house, bring it in the house. Help him.

"Q. You brought the gun in the house while you were helping Moody in the house?

"A. Nah. I left the gun in the car. I helped Moody in the house.

"Q. So the gun was left in the car.

"A. Yeah. Until somebody got it out of the car.

"Q. Do you know who took the gun out of the car?

"A. Positively, no. I don't. You think I'm lying but I don't.

\* \* \*

"Q. Larry, after the shooting is done Moody drives off, he says he's hit. He goes home, is that correct?

"A. Yes.

"Q. You help him into the house?

"A. Yes.

"Q. You don't know what happened to the gun?

"A. He left the gun in the car I guess. We weren't thinkin' about a gun. He was shot.

"Q. You didn't put the gun under the porch?

"A. No.

"Q. Were you asked to put the gun under the porch?

"A. I don't know. He was sayin' somethin'. I think he was sayin'—I don't know, man, I'm not sure. I just know he kept sayin' I'm shot, shot."

[4] Specifically, the court stated: "Those are the three sections that I believe are admissible. I will permit them to come in, and if they come in, I will

excerpts from the police statement were admissible, the defendant never offered them into evidence, nor did he make any subsequent attempt to have the full police statement admitted.

We begin by setting forth the applicable standard of review. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . This deferential standard is applicable . . . to questions relating to prior consistent statements . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801–802, 709 A.2d 522 (1998).

As stated, the defendant did not make any further attempts to have the police statement admitted into evidence after the court's ruling on the motion in limine. Nevertheless, on appeal, the defendant relies heavily on the prosecutor's use of the police statement to impeach Smith's testimony during recross-examination after the court's ruling. "This court will not review issues of law that are raised for the first time on appeal. . . . We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim." (Citation omitted; internal quotation marks omitted.) *State* v. *Beliveau*, 52 Conn. App. 475, 479, 727 A.2d 737, cert. denied,

---

instruct the jury that they are coming in to be considered only on the question of Mr. Smith's credibility and not as proof of the facts stated in this statement. You know, if the defense chooses to offer those, they will be admitted. If not, that's, obviously, your option as far as if you choose to offer them or not."

249 Conn. 920, 733 A.2d 235 (1999). Because the defendant did not argue before the court that the prosecutor's use of portions of the police statement during recross-examination of Smith rendered the full police statement admissible, that argument is unpreserved and therefore is unreviewable. Consequently, we give no consideration in our analysis to the prosecutor's use of the police statement during recross-examination.

The remainder of the defendant's claim amounts to the following. The defendant argues that the court should have permitted the introduction of the full police statement to rebut the prosecutor's implication that Smith recently had fabricated his testimony that he and the defendant were present near the intersection of Day and George Streets because the defendant was driving Smith home. The defendant further argues that the full police statement should have been admitted to provide context for Smith's statements to the police that he had left the gun in the car and did not know the defendant's full name.[5]

## A

We first consider whether the court improperly concluded that the full police statement was not admissible

[5] The defendant also claims that the court improperly declined to permit the jury to hear the tape recording of Smith's statement. He argues that the jury should have been permitted to hear the tape recording, rather than simply read the transcript, because certain statements cannot properly be understood without hearing the speaker's tone of voice. The defendant, however, failed to have the tape recording marked as an exhibit; the tape therefore is not part of the record on appeal. "The duty to provide this court with a record adequate for review rests with the appellant. Practice Book § 61-10. . . . Conclusions of the trial court cannot be reviewed where the appellant fails to establish through an adequate record that the trial court incorrectly applied the law or could not reasonably have concluded as it did . . . . The purpose of marking an exhibit for identification is to preserve it as part of the record and to provide an appellate court with a basis for review." (Citation omitted; internal quotation marks omitted.) *Daigle* v. *Metropolitan Property & Casualty Ins. Co.*, 257 Conn. 359, 364, 777 A.2d 681 (2001). Accordingly, we do not review the defendant's claim that the tape recording was excluded improperly.

to rebut the prosecutor's implication that Smith recently had fabricated his testimony regarding the reason for the defendant's presence at the location of the shooting.

"Although the general rule is that prior consistent statements of a witness are inadmissible, we have recognized exceptions in certain circumstances. Major exceptions include using the prior consistent statement to rehabilitate a witness who has been impeached by a suggestion of bias or interest arising subsequent to the prior statement . . . by a suggestion of recent contrivance . . . by a charge of faulty recollection . . . or by a prior inconsistent statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, 67 Conn. App. 643, 651–52, 789 A.2d 519, cert. denied, 261 Conn. 938, 808 A.2d 1133 (2002). "Whether the circumstances support the admission of [prior consistent statement] evidence is left to the discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Vines*, 71 Conn. App. 359, 368, 801 A.2d 918, cert. denied, 261 Conn. 939, 808 A.2d 1134 (2002). Section 6-11 of the Connecticut Code of Evidence provides in relevant part: "(a) Except as provided in this section, the credibility of a witness may not be supported by evidence of a prior consistent statement made by the witness. (b) . . . If the credibility of a witness is impeached by . . . (3) a suggestion of recent contrivance, evidence of a prior consistent statement made by the witness is admissible, in the discretion of the court, to rebut the impeachment. . . ." Conn. Code Evid. § 6-11.

A review of the full police statement reveals that it does not contain any statement consistent with Smith's testimony that he and the defendant were present near the intersection of George and Day Streets because the defendant was giving Smith a ride home. As Smith acknowledged during cross-examination, he did not mention that fact in his statement to the police. Consequently, the court did not abuse its discretion when

it declined to permit the admission of the full police statement to rebut the prosecutor's implication of recent fabrication.

B

We next address the defendant's argument that Smith's full statement should have been admitted to provide the jury with context for Smith's statements. Specifically, the defendant argues that admission of the full statement was necessary to prevent the jury from being misled by Smith's comments to police that he left the gun in the car and that he did not know the defendant's full name. With regard to Smith's statement to police that he did not know the defendant by any name other than "Moody," the defendant argues that the jury should have had an opportunity to consider the precise question that the interviewing officer had asked Smith: "Do you know him by any other name, his first name or street name?" According to the defendant, that question sounds as if the officer was asking whether Smith knew the defendant by an alias, rather than asking whether Smith knew the defendant's first name. The defendant in his principal brief further argues that the full statement should have been admitted because Smith's statement that he left the gun in the car "implies a far greater control over the firearm than the statement, read in the context of the entire interview, conveys."

The defendant asserts that the transcript of the full police interview with Smith was admissible under the principle that "[w]hen a party has impeached a witness with portions of a statement that are inconsistent with his or her trial testimony, the trial court may, in its sound discretion, admit the entire statement for rehabilitative purposes, in order to place the allegedly inconsistent statement into context and to prevent the jury from being misled." *State* v. *Hines*, supra, 243 Conn. 807–808.

The defendant's argument ignores the fact that the court, in its ruling on the defendant's motion in limine, determined that it would admit the relevant sections of the transcript upon an offer by the defendant.[6] Despite that ruling, the defendant never offered those sections of the transcript into evidence. An examination of the transcript of the police statement reveals nothing, apart from those sections, that would have been relevant to place into context, or prevent the jury from being misled by, the statements used by the prosecutor for impeachment purposes.[7] Consequently, if the jury was unable to place Smith's statements in context, as argued by the defendant, it was not because of any erroneous ruling by the court, but because of the defendant's failure to offer the sections of the police statement that the court already had ruled admissible. Because no additional sections of the transcript were relevant, we conclude that the court did not abuse its discretion by declining to admit the full transcript of the police statement into evidence to provide a context for Smith's statements.

## II

The defendant next claims that he was denied a fair trial because the prosecutor committed misconduct during cross-examination and in closing argument to the jury. Specifically, the defendant argues that the prosecutor improperly (1) compelled him to characterize the veracity of other witnesses and then emphasized that characterization in closing argument, (2) appealed to the emotions, passions and prejudices of the jurors, and (3) expressed his personal opinion as to the defendant's guilt.

---

[6] See footnote 3.

[7] Furthermore, as previously stated, Smith admitted at trial that he had lied to police when he told them he did not know the defendant by any name other than Moody.

The defendant concedes that he did not object to the alleged prosecutorial misconduct at trial and that his claim therefore is not properly preserved. He may prevail on his unpreserved claim of prosecutorial misconduct, however, if he satisfies all four requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Those four requirements are: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." Id.

"To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . .

"Prosecutorial misconduct may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . .

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process,

[our Supreme Court], in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"As is evident upon review of these factors, it is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 699–702, 793 A.2d 226 (2002).

## A

The defendant first argues that the prosecutor committed misconduct by compelling him to characterize the testimony of other witnesses and then emphasizing that characterization in closing argument.

The following additional facts are relevant to that issue. At trial, the state called Carlos Stewart, Jr., a New Haven police officer, as a witness. Stewart testified to the following facts. On November 9, 1994, he received a dispatch over his police radio indicating that there was an individual with a gunshot wound at 115 Beers Street. When Stewart arrived at that address, he observed a black male with a gunshot wound to his upper left leg. The wounded man identified himself as Sean Dent. A woman at the scene told Stewart that her name was Diane Dent and that she was Sean Dent's mother.

The defendant subsequently took the witness stand. During cross-examination, the defendant admitted that he had given Stewart a false name. The cross-examination continued as follows:

"[Prosecutor]: And [Stewart] talks to your mom, right?

"[Defendant]: Yes.

"[Prosecutor]: And your mom doesn't give him her true name, right?

"[Defendant]: My mother wasn't out there with me.

"[Prosecutor]: Well, didn't you just say you were—that the police officer talked to your mom?

"[Defendant]: No, I never said that.

"[Prosecutor]: Did he talk to your mom?

"[Defendant]: No.

"[Prosecutor]: He didn't. So, when he testified that he talked to somebody who identified themselves as your mother and gave the last name Dent, that police officer wasn't telling the truth?

"[Defendant]: Yes.

"[Prosecutor]: Okay. So, that police officer was lying?

"[Defendant]: He talked to somebody, but he didn't talk to my mother.

"[Prosecutor]: Well, if your mother wasn't out there, how do you know he didn't talk to her?

"[Defendant]: He was talking to the people upstairs.

"[Prosecutor]: So, one of the people upstairs identified themselves as your mother and gave the name Dent?

"[Defendant]: Yes."

The defendant also testified that when he and Smith had reached the defendant's house after the shooting, the defendant told Smith to "put the gun up." The defendant explained that this meant that he wanted Smith to put the gun someplace other than in the house. The defendant further testified that Smith stated that he had placed the gun under the steps. The prosecutor then asked the defendant, "So, when [Smith] testified the other day that he didn't know what happened to the gun, that was a lie. Is that correct?" The defendant replied, "I don't know."

During closing argument, the prosecutor stated: "[Y]esterday . . . the defendant had the gall to call Officer Carlos Stewart a liar. Remember, Stewart was the one who came there. He was the first cop on the scene to aid [the defendant], who's suffering from a gunshot wound, who's lying outside his house. He's lying outside. In fact, he's lying outside the back of his

house where there just happens to be, you know, four or five more shell casings fired from his gun, and he has the gall to call Stewart a liar. Now, he's calling Officer Stewart a liar."

Our Supreme Court has held that it is improper to ask a witness to comment on another witness' veracity. *State* v. *Singh,* supra, 259 Conn. 712. "[I]t is well established that determinations of credibility are for the jury, and not for witnesses. . . . Consequently, questions that ask a defendant to comment on another witness' veracity invade the province of the jury. . . . Moreover, [a]s a general rule, [such] questions have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission and in determining the ultimate issue of guilt or innocence. . . .

"[Q]uestions of this sort also create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied. . . . This risk is especially acute when the witness is a government agent in a criminal case. . . . A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved . . . such as misrecollection, failure of recollection or other innocent reason. . . .

"Similarly, courts have long admonished prosecutors to avoid statements to the effect that if the defendant is innocent, the jury must conclude that witnesses have lied. . . . The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover, like the problem inherent in asking a defendant to comment on the veracity of another witness, such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than

deceit." (Citations omitted; internal quotation marks omitted.) Id., 707–10.

Applying those principles to the present case, we conclude that the prosecutor did not argue, as the prosecutor in *Singh* did, that the jury could find the defendant not guilty only by concluding that the state's witnesses had lied. Nevertheless, the prosecutor asked the defendant during cross-examination whether Smith and Stewart had lied in their testimony. Those questions were improper because they violated the principle that a witness may not be asked to comment on another witness' veracity.

## B

The defendant next argues that the prosecutor committed misconduct by appealing to the emotions, passions and prejudices of the jurors. Specifically, he argues that the prosecutor, in closing argument, improperly appealed to the jurors' sympathy for the victims.

The defendant takes issue with the following portion of the prosecutor's closing argument: "You know, it's sad here. You've got Mr. Doughty, who had an injury to his leg, seventeen years old at the time. It's even sadder, you had Marquis Clark, an eighteen year old kid, suffered catastrophic injuries, and, you know, your verdict isn't going to return Mr. Clark to his family. Your verdict isn't going to return a normal healthy leg to Mr. Doughty. And, you know, you could perhaps feel, 'Why, as a juror in this case, am I going to compound this and convict [the defendant] of this—these crimes?' And that's understandable. But ladies and gentlemen, you remember during the jury selection, you weren't chosen to do the easy thing here. You're here to do what the law and what justice requires."

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the pros-

ecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, supra, 259 Conn. 719.

We conclude that the prosecutor's remarks were not improper. Although the prosecutor characterized the victims' injuries as "sad" and "even sadder," those comments, when viewed in context, cannot be said to have appealed to the passions, emotions or prejudices of the jurors. On the contrary, the point of the prosecutor's argument was that the jury's verdict should be based on the law and evidence, rather than on sympathy. Accordingly, we conclude that the prosecutor's comments did not rise to the level of misconduct.

C

In his final claim of prosecutorial misconduct, the defendant argues that the prosecutor improperly expressed his personal opinion as to the defendant's guilt. Specifically, the defendant argues that the prosecutor committed misconduct when he stated: "You know, when I was thinking about how to begin this closing statement, I was wondering, should I start with how strong the evidence in this case is, and . . . *I believe that it certainly proves beyond a reasonable doubt that the defendant is responsible for the death of Mr. Clark and the shooting of Mr. Doughty.* What I believe is not evidence. Okay. *It's what I feel I've proved in this case,* but you are the final finders of fact. You're going to hear the law in this case. This argument is only a persuasive element of the trial. It's not what I believe here that is important. It's not what [defense counsel]

believes is important. It's what you believe has been proven in this case." (Emphasis added.)

A prosecutor may not express his own opinion, directly or indirectly, as to the guilt of the defendant. *State* v. *Singh*, supra, 259 Conn. 713. "Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) Id.

"It does not follow from this, however, that every use of rhetorical language is improper. We emphasize that closing arguments of counsel are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. . . . Therefore, because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Citation omitted; internal quotation marks omitted.) *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 399–400, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999).

"Undoubtedly, using the pronoun 'I' in an argument increases the chances that appropriately structured arguments will deteriorate into expressions of personal opinion. Prosecutors should be circumspect and artful in designing their arguments to avoid having a jury misinterpret such remarks as improper expressions of personal opinion." Id., 401. Nevertheless, "[t]he mere use of phrases such as I submit, I find, or I believe does not constitute improper argument. . . . Use of the personal pronoun I is a normal and ordinary use of the English language. If courts were to ban the use of it, prosecutors would indulge in even more legalese than the average lawyer, sounding even more stilted and unnatural." (Citations omitted; internal quotation marks omitted.) Id., 400.

In the present case, the prosecutor's statements that he believed and felt that the evidence proved the defendant's guilt beyond a reasonable doubt did not constitute improper argument. Those comments clearly related to the strength of the evidence, rather than the prosecutor's personal belief as to the defendant's guilt. Because the prosecutor specifically was addressing the strength of the evidence presented at trial, there was no danger that the jury would infer that his comments were based on his personal knowledge of matters not in evidence. Furthermore, the comments were followed immediately by the prosecutor's admonition that the beliefs of counsel were irrelevant and that only the jurors' beliefs mattered. Although the prosecutor's comments might have been more carefully worded, we conclude that they did not constitute improper expressions of personal opinion regarding the defendant's guilt.

D

Having concluded in part II A that the prosecutor committed misconduct by asking the defendant to comment on the veracity of other witnesses, we must now

determine whether that misconduct was so serious as to amount to a denial of due process. We conclude that it was not.

The prosecutor's misconduct was not invited by defense conduct or argument. Although the misconduct had a bearing on a critical issue in the case, namely, the credibility of the defendant's claim of self-defense, it was not central to that issue. While that particular type of misconduct is severe, it was limited in the present case to two brief questions on cross-examination. We also note that the state had a strong case against the defendant.

Moreover, the prejudicial effect of the misconduct was minimized both by the defendant's answers to the improper questions and by the court's jury instructions. As noted, when the prosecutor asked the defendant whether Stewart had lied about having been given a false name by the defendant's mother, the defendant offered the explanation that the person Stewart had spoken to was someone other than his mother. When the prosecutor asked the defendant whether Smith had lied, the defendant answered that he did not know. The fact that the defendant gave those answers, rather than merely labeling the other witnesses as liars, minimized any risk that the jury would conclude that to acquit him, it had to find that the other witnesses had lied. In addition, the court specifically instructed the jurors that they were the sole triers of the witnesses' credibility. For all of the foregoing reasons, we conclude that the defendant was not deprived of a fair trial by the prosecutor's misconduct. The defendant has failed to satisfy the third prong of State v. Golding, supra, 213 Conn. 239–40, and therefore cannot prevail on his unpreserved claim of prosecutorial misconduct.

E

The defendant argues in the alternative that we should exercise our supervisory authority to reverse

his conviction because of the prosecutor's misconduct. We conclude that this is not an appropriate case for such an exercise of our supervisory authority.

"Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000).

"Reversal of a conviction under [such] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 813, 699 A.2d 901 (1997). "[R]eversal of a conviction under our supervisory authority generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribu-

nal." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 465, 797 A.2d 1088 (2002).

In *State* v. *Payne*, supra, 260 Conn. 446, our Supreme Court exercised its supervisory authority to reverse a judgment of conviction because of misconduct by the same prosecutor involved in the present case. That decision was based in part on a conclusion that the prosecutor had engaged in a pattern of misconduct not only in *Payne* itself, but in other cases as well. Id. The court stated that "the prosecutor . . . repeatedly committed serious prosecutorial misconduct and our experience counsels that nothing short of reversal will deter similar misconduct in the future." Id., 466. At oral argument in the present case, we ordered the parties to file supplemental briefs on whether, in light of the holding in *Payne*, we should likewise reverse the present case under our supervisory authority.

After reviewing the parties' briefs, we conclude that this is not an appropriate case for reversal under our supervisory authority. As we concluded in part II D, the two brief instances of misconduct in the present case were minimally prejudicial, in contrast to the misconduct in *Payne*, which "significantly prejudiced [the] defendant." Id., 464. We also note that another sanction not only was available, but has in fact already been imposed, namely, the Supreme Court's reversal in *Payne*. The misconduct in the present case occurred prior to our Supreme Court's opinion in *Payne*. We therefore cannot conclude from the misconduct in the present case that the sanction imposed in *Payne* was inadequate as a deterrent to future misconduct. In light of the minimally prejudicial nature of the misconduct in the present case and the fact that another sanction already has been imposed, we conclude that this is not a case in which the prosecutor's conduct "is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integ-

rity of the tribunal." (Internal quotation marks omitted.) Id., 465. We therefore decline to exercise our supervisory authority to reverse the defendant's conviction.

## III

The defendant's final claim is that the court failed to investigate adequately whether jurors saw certain notes made by the prosecutor, which were inadvertently given to an alternate juror. Specifically, the defendant argues that the court improperly (1) failed to ascertain whether any of the jurors had seen the notes on a previous occasion and (2) failed to ask each juror individually whether he or she had seen the transcript. We disagree with the defendant's first argument and decline to consider the second argument because it was not properly preserved for appellate review.

The following additional facts are relevant to the defendant's claim. On December 8, 2000, the state called Gilbert Burton, a detective with the New Haven police department, as a witness. Burton testified that he interviewed the defendant on the day of the shooting and that the interview was tape recorded. The court permitted the state to play the tape recording of the interview for the jury. The court also allowed the state to distribute to the jurors copies of the interview transcript bearing the defendant's signature. After the jurors had listened to the tape recording, the sheriff collected the copies of the transcript from them.

On December 14, 2000, during the state's cross-examination of the defendant, transcripts of the defendant's tape-recorded statement again were distributed to the jury. Immediately before the next recess, the clerk informed the court that one of the jurors had received a copy of the transcript on which there were handwritten

notes.[8] After the recess, the court questioned B,[9] the alternate juror who had received that copy of the transcript. B indicated to the court that although she had read the handwritten comments on the transcript, she could set aside anything she had read and make her own independent judgment based on the evidence. The defendant requested that the court excuse B or, in the alternative, to instruct B individually or the entire jury as a group not to discuss the handwritten notes. The court denied the request to excuse B, but explained to the entire jury that there had been a delay in the proceedings because B's copy of the transcript "had some markings on it that shouldn't have been there." The court reminded the jurors not to discuss the case among themselves and instructed them specifically not to discuss the markings on B's copy of the transcript. B was given a clean copy of the transcript and the trial resumed.

At the close of evidence on December 15, 2000, the defendant orally requested a mistrial on the ground that B had read the handwritten notes on the transcript. The court denied the motion for a mistrial. The jury began its deliberations, and the court dismissed the alternate jurors, including B.

On December 18, 2000, the court stated on the record that on December 15, 2000, the clerk heard other jurors saying reassuring words to B before she entered the courtroom to be questioned by the judge about the transcript. Also on December 18, 2000, the defendant filed a written motion for a mistrial. In addition to renewing the grounds for the previous motion for a mistrial, the defendant raised two additional grounds. First, the defendant sought a mistrial on the basis of

---

[8] The prosecutor acknowledged his responsibility for the error, stating: "It's a big mistake, and I apologize to the court."

[9] In the interest of protecting the juror's privacy, we choose not to use her name.

the reassuring words spoken to B by other jurors. Second, the defendant argued that a mistrial was appropriate because it was not clear whether any juror had received the copy of the transcript containing the handwritten comments when the transcripts were first distributed on December 8, 2000.

The jurors were brought into the courtroom and the court proceeded to ask them two questions. First, the court inquired whether any other juror had received a transcript with extraneous markings.[10] None of the jurors indicated that they had. Second, the court asked whether B had discussed the writing on the transcript with any of the other jurors. The jurors all responded in the negative. One juror responded that B had indicated that she had received something that she should not have, but that B did not elaborate on what she had received. The court cautioned the jury not to let the incident affect its deliberations in any way. The defendant argued that "the canvass didn't solve the problem." The court responded that it thought the canvass was adequate and denied the motion for a mistrial.

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct[11] or partiality. . . . [A]lthough the form and scope

---

[10] The court inquired of the jurors as follows: "One of your members, [B], who was an alternate juror, mistakenly received a copy of a transcript that had some handwriting in the margins and some underlining on it. I think all of you received a transcript that had some corrections that [the defendant] had made with the police officer. I'm not talking about that. I'm talking about underlining and handwritten notes in the margin of the document itself. So, my first question is this: Did anyone else receive a transcript that had those sorts of marking on them?"

[11] "[W]hen we refer to the rubric of jury misconduct with respect to the jury's exposure to extrinsic material, we include both the jury's intentional and inadvertent exposure to such material." *State* v. *Brown,* 232 Conn. 431, 446, 656 A.2d 997, superseded on other grounds, 235 Conn. 502, 668 A.2d

of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jur[or] misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." (Citation omitted; internal quotation marks omitted.) *State* v. *Dorans*, 261 Conn. 730, 751–52, 806 A.2d 1033 (2002).

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of [juror bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion, weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of an alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred." (Internal quotation marks omitted.) *State* v. *Roman*, 262 Conn. 718, 727, 817 A.2d 100 (2003).

1288 (1995). Our use of the phrase "jury misconduct" in the present case should not be interpreted as implying any culpability on the part of any juror.

The defendant argues that the court improperly failed to ascertain whether any of the jurors had seen the handwritten notes on the transcript when it was first distributed on December 8, 2000. We note, however, that the court specifically asked the jurors whether any of them had received a transcript containing extraneous markings and that no juror answered that question in the affirmative. The court's question was broad enough to encompass both occasions on which the transcripts were distributed to the jury. Although the defendant may have preferred for the court to specifically ask the jurors about the December 8, 2000 distribution of transcripts, we conclude that the court did not abuse its discretion by not asking about that specific date.

The defendant further argues that the court failed to ask each juror individually whether he or she had seen the transcript with the handwritten notes. That argument is raised for the first time on appeal. Because the defendant failed to preserve the issue properly by raising it in the trial court, it is unreviewable. See *State v. Beliveau*, supra, 52 Conn. App. 479.

The judgment is affirmed.

In this opinion the other judges concurred.