## STATE OF CONNECTICUT *v.* BENTON O'NEIL DAWES
## (AC 30292)

Bishop, Gruendel and Pellegrino, Js.

---

Argued March 17—officially released July 6, 2010

*Raymond L. Durelli*, special public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, special deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *James M. Bernardi*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Benton O'Neil Dawes, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a

firearm in violation of General Statutes §§ 53a-55 (a) (1) and 53a-55a. He claims that (1) prosecutorial impropriety deprived him of a fair trial, (2) this court should exercise its supervisory powers and set aside his conviction because the prosecutor engaged in deliberate prosecutorial impropriety and (3) the trial court improperly failed sua sponte to instruct the jury on a statutory exception to self-defense. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At all relevant times, the defendant owned the Cool Runnings bar on Stillwater Avenue in Stamford. On June 16, 2006, the defendant was involved in an altercation with Vaness Ford, a bar patron, regarding the use of a billiard table. The defendant exited the bar and reported the altercation to a nearby police officer. In response, the officer entered the bar, approached Ford and requested that he vacate the premises. Ford complied. Once outside, Ford informed the officer that the defendant was carrying a handgun. When the officer later asked the defendant about that allegation, he responded that "everybody knows I have a gun."

Twelve days later, another altercation between the defendant and Ford transpired. On the evening of June 28, 2006, the defendant walked from his bar to the nearby Two Brothers grocery store to purchase lottery tickets. Upon entering, he encountered Ford, and an argument ensued concerning the events of June 16, 2006. As the argument escalated, Ford jabbed his finger into the defendant's forehead, and the defendant responded by throwing a bottle of juice his way. When the defendant charged Ford, Ford tackled him to the ground, repeatedly punching the defendant and striking him with a can that had fallen from a shelf. The defendant eventually asked Ford to get off of him, and Ford complied. Backing away from the defendant, Ford took

off his shirt and proclaimed that "I am stronger than you are, and I can do whatever I want to you." The defendant replied, "Okay, you beat me, but this doesn't finish here. You are going to see who I am." At that moment, the defendant took out his handgun and fired a gunshot at Ford, causing him to collapse to the ground.

When Officer Jerry Junes arrived at the scene, he found Ford lying on the floor with a gunshot wound to his throat. Ford died a short time later. While at the scene, the defendant stated to Junes, "Officer, I did it." Junes and other officers of the Stamford police department collected evidence, including the weapon used in the shooting, a shell casing found on the floor, blood samples and a surveillance tape that captured the encounter, and interviewed witnesses, including Yamil Taveras, owner of the grocery store, Jose Gilberto Leonardo, a store employee, and Andre DeJesus, a patron present during the encounter.

The defendant thereafter was arrested and charged, by long form information dated July 12, 2006, with manslaughter in the first degree with a firearm in violation of §§ 53a-55 (a) (1) and 53a-55a. A trial followed, at which the defendant presented a theory of self-defense and testified. At the conclusion thereof, the jury found the defendant guilty. The court rendered judgment accordingly and sentenced the defendant to twenty-five years incarceration, execution suspended after fourteen years, with five years of probation. From that judgment, the defendant appeals.

I

The defendant first claims that prosecutorial impropriety during closing argument deprived him of a fair trial. We disagree.

It is well established that "a claim of prosecutorial impropriety, even in the absence of an objection, has

constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . .

"The . . . determination of whether the defendant was deprived of his right to a fair trial . . . involve[s] the application of the factors set out by this court in *State* v. *Williams*, [supra, 204 Conn. 540]. . . . In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, [this] court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Gould*, 290 Conn. 70, 77–78, 961 A.2d 975 (2009).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the

jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Rowe*, 279 Conn. 139, 158–59, 900 A.2d 1276 (2006).

The defendant identifies nineteen statements from the prosecutor's closing argument that allegedly constitute impropriety. The defendant sorts the statements into three categories—comments on the credibility of

witnesses, references to facts that were not in evidence and comments on extraneous matters. We address each in turn.

## A

### Comments on Credibility

The defendant contends that the prosecutor improperly expressed his opinion on the credibility of the defendant and DeJesus during closing argument. We begin by detailing the challenged statements and the context in which they arose.

The first four challenged statements concern the defendant. The prosecutor first stated: "What we see next on the [grocery store surveillance] tape . . . is the defendant getting pushed back across the front of the counter in the bodega to where he came from. They go onto the floor and they go off camera. Now, while the event is going on on the floor, you have the testimony of some of the witnesses with regard to what it is that they saw. Now, the defendant, who was there himself as a witness, says he was beaten with the can into a blind senselessness. That is nonsense and you know it. [Grocery store owner] Taveras saw the whole thing and said he got hit with the can once. And then the victim hit the defendant with his fists." The second challenged statement was as follows: "Let's talk about the first element, that the defendant honestly believed, when he pulled the trigger, that he had to do so, to repel an attack, an imminent attack that would inflict great bodily harm upon him. The best answer to that question, did he hold that honest belief, would have been some honest testimony from the defendant. That is the one thing that is wholly and totally lacking in this case."

In the third challenged statement, the prosecutor noted that "[i]n his direct testimony, as I just indicated, [the defendant] gave that tearful rendition and talked

about shooting at a disembodied approaching voice. He insisted that that is what he saw, a voice. On cross-examination he avoided every question that I asked him, turning what should have been twenty minutes of questions into a three hour ordeal. Common sense suggests that you have something to hide when you avoid every question and even refuse to look at the [surveillance tape], apparently both before the trial and during the trial. That is not honest testimony. And it is not honest testimony because honest testimony would have betrayed, beyond a reasonable doubt, that he knew he did not face the threat of imminent, great bodily harm. With regard to that tape, he has even stated on direct that he has avoided looking at that tape for two years. Common sense and logic suggest that his avoiding the tape and the questions of the prosecutor betrays a man who is not going to let the truth and the facts and the questions stand in the way of his story. He has got his story and he has had it basically from day one, which is, he doesn't remember, which is the same thing as saying I am not going to talk about it. He has got that story and he is sticking with it, just like that expression, that is my story and I am sticking with it. And nothing is going to move him from that story, not the [surveillance tape], not the questions, not the truth, nothing is going to make him move from that story. If you find a faint ring of truth to his story, if some of you may have thought you heard that, common sense suggests that that is a false ring, a faint and false ring. Common sense suggests that he has lived that lie for the last two years and practiced that lie. Whether he was talking to people at work or whomever, that lie has been lived and practiced for so long that it sounds like he is beginning to believe it and cry about it himself. It is not honest testimony." In the fourth challenged statement, the prosecutor indicated that, "[a]nd finally, even if [the defendant] had that honest belief, which I

submit to you, beyond a reasonable doubt the evidence clearly shows here he did not have that reasonable belief, as a matter of fact we haven't heard anything honest from him, it was unreasonable for him to have that belief."

In the fifth challenged statement, the prosecutor addressed the testimony of DeJesus: "A word about the credibility of that young man who sat there [at the grocery store on the evening of June 28, 2006] callously watching this thing, eating an apple, never pulling out his cell phone and making a call or trying to get assistance or trying to break it up, he said he wasn't biased toward the defendant. Yet, he testified that he was sure that that can, that Hawaiian Punch can, was the exact can that Ford hit the defendant with. Now, how could you possibly know that? One Hawaiian Punch can looks just like any other. And then when I said, weren't there other Hawaiian Punch cans in there, he says he remembers there were six or seven on the shelf that night. Now, was he taking inventory that night? Nobody would remember a fact like that. I could have sat here, I could have asked him, how many Pringles cans were there, but what is the point? The point is that in his bias, he was just saying what he had to say to make his point. That is not credible testimony. That type of testimony is the telltale sign of a witness who is not being truthful with you. He had to be shown the [surveillance tape] to refresh his recollection that the victim was backing up when he was shot. That is clear as a bell on the film. He didn't even want to give that fact up. For whatever reason, he was biased."

It is well settled that "[although a] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses. . . . Such expressions of personal opinion are a form of unsworn

and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 815, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

We conclude that the prosecutor's comments were not improper. The comments were based on the evidence adduced at trial and reflect an effort on the part of the prosecutor to invite the jury to draw the reasonable inference that the testimony lacked credibility. See, e.g., *State* v. *Luster*, 279 Conn. 414, 438, 902 A.2d 636 (2006) (prosecutor may properly comment on credibility of witness where comment reflects reasonable inferences from evidence adduced at trial); *State* v. *Richard W.*, 115 Conn. App. 124, 135–36, 971 A.2d 810 ("[i]t is without question" that prosecutor may fairly comment on evidence and reasonable inferences to be drawn that lead jury to conclusion as to credibility of witnesses), cert. denied, 293 Conn. 917, 979 A.2d 493 (2009). As in *State* v. *Stevenson*, 269 Conn. 563, 849 A.2d 626 (2004), the prosecutor's remarks underscored inferences "that the jury could have drawn entirely on its own, based on the evidence presented." Id., 585. In addition, the prosecutor's repeated calls to the jury's common sense undermine the defendant's contention that he expressed a personal opinion. *State* v. *Luster*, supra, 437; see also *State* v. *Cromety*, 102 Conn. App. 425, 440, 925 A.2d 1133 ("prosecutor may ask the jury to apply common

sense and experience to determine credibility"), cert. denied, 284 Conn. 912, 931 A.2d 932 (2007); *State* v. *Lindo*, 75 Conn. App. 408, 416, 816 A.2d 641 ("[r]emarks that are nothing more than a permissible appeal to the jurors' common sense do not constitute prosecutorial [impropriety]"), cert. denied, 263 Conn. 917, 821 A.2d 771 (2003). Tellingly, the prosecutor never used the word "I" or stated that he based his argument on his personal beliefs. See *State* v. *Moody*, 77 Conn. App. 197, 217, 822 A.2d 990 (use of pronoun "I" in argument increases chances that appropriately structured arguments will deteriorate into expressions of personal opinion), cert. denied, 264 Conn. 918, 827 A.2d 707, cert. denied, 540 U.S. 1058, 124 S. Ct. 831, 157 L. Ed. 2d 714 (2003). The prosecutor did not improperly express his opinion on the credibility of witnesses.

B

Facts That Were Not in Evidence

The defendant next claims that the prosecutor improperly argued facts that were not in evidence. "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997); see also *State* v. *Fauci*, 282 Conn. 23, 49, 917 A.2d 978 (2007) ("prosecutor may not comment on evidence that is not a part of the record").

The defendant identifies seven comments made by the prosecutor during closing argument that he claims amount to improper commentary on facts that were not in evidence. On our review, we conclude that all but one constitute arguments inviting the jury to draw reasonable inferences from the evidence adduced at

trial. Such statements patently are proper. See *State* v. *Swain*, 101 Conn. App. 253, 272, 921 A.2d 712 ("the prosecutor had the prerogative to invite the jury to draw reasonable inferences from the facts in evidence and could argue on the basis of such inferences"), cert. denied, 283 Conn. 909, 928 A.2d 539 (2007).

The one questionable comment by the prosecutor is his statement that Ford "did not inflict any bodily harm upon the defendant." That statement confounds the trial testimony of Waiho Lum, an emergency room physician, who opined that the defendant suffered "a mild facial contusion and mild contusion to the elbow and also a scrape, an abrasion on his upper back [on which Lum] provided wound care . . . ." Lum also testified that he observed mild swelling under the defendant's left eyelid. The prosecutor's comment nevertheless highlights the distinction between misstatement and misconduct. Cf. *State* v. *Orellana*, 89 Conn. App. 71, 105, 872 A.2d 506 (2005) (isolated misstatement not prosecutorial impropriety), cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). The prosecutor's comment appears to be mere hyperbole, as Lum testified at trial that the defendant had not suffered any substantial injury. In addition, the challenged comment was preceded by the prosecutor's acknowledgement that the defendant suffered a "cut on his head," as well as "some back bruising and the makings of a shiner under his left eye." In light of the foregoing, we conclude that the challenged statement, considered within the context in which it was made, was not improper.

## C

### Extraneous Matters

The defendant also argues that the prosecutor improperly referenced extraneous matters during closing argument. "A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from

its duty to decide the case on the evidence. . . . A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, supra, 293 Conn. 809.

The defendant takes issue with seven comments made by the prosecutor, five of which pertain to the defendant's alleged provocation of the grocery store confrontation and two of which pertain to the defendant's alleged failure to take reasonable measures other than shooting Ford.[1] His claim is premised on the fact

[1] The five comments regarding the defendant's alleged provocation of the confrontation are as follows. The prosecutor first stated: "Now, let's talk about the defendant. He is the self-described proud owner of the barroom from which [Ford] was bounced, a man who left his glass of wine on the bar and his girlfriend behind in the bar to play his numbers at the local bodega, the local grocery store. And common sense tells us that, as he walked down the block, maybe there was just a little added strut to his step because he left the saloon knowingly and foolishly carrying a concealed .40 caliber Glock handgun under his waistband, pressed against his hip, a legal, but not under any circumstances, a wise decision."

The prosecutor next stated: "And we see on that [surveillance] tape that [Ford], the victim, starts in arguing about the defendant, call[ing] the police on him a week and a half before and how he got escorted from that bar. And as Yamil Taveras, and through the interpreter, I believe, Jose Leonardo testified, in the first few minutes there, both men foolishly and recklessly trade insults and curses. Foolish for [Ford] because he does not realize the concealed source of the smaller defendant's courage; reckless for the defendant because he knows he has a .40 caliber handgun on his hip."

In the third challenged comment, the prosecutor stated: "But the defendant does not have the owner make that call. And as the rest of the facts show, his own sense of vanity and his own sense of machismo forbid it. When the victim returns, among other things, the defendant tells him to kiss his behind. You heard what the testimony was. He freely admitted that during his testimony with defense counsel. Curiously, those are not the words of a fearful man. And when the argument continues, he recklessly provokes the defendant by bringing his momma into the argument and making a comment about how he lives at home. How did he know that? A double-barreled insult to [Ford's] manhood and an insult to his mother."

that "[t]he prosecutor made these comments with full

In the fourth challenged comment, the prosecutor stated: "You can take a survey of the whole state of Connecticut and not find many people who would have recklessly said something like that in that situation. That goes beyond standing up to intimidation or bullying. That is asking for a fight. And if anyone is sure to know that those are fighting words, it is the defendant. He has been running a bar for the last four years before this happened. You say something like that in a bar or saloon, or even at a wedding at a country club, and a fight is sure to break out. He knew that. He knew that then, when he said it. What he has forgotten when he says that is, he is not standing in his own bar where everyone knows he carries a gun, where he gets to tell people what he expects of them, like he wrote down in his statement in his own hand, where they must listen or they must get out, where if you make a complaint to the police, the ruling is he is the owner, he is right, you get out. He is confronting here, where he is confronting an angry man in a grocery store, that kind of arrogance is misplaced. That permit to carry did not put a star on his vest that made him the sheriff of Stillwater Avenue. And since he is sure to lose a fair fight with hands, with your fists, with [Ford], one wonders just what is the hidden secret of the defendant's bravado. What gives a man that kind of hidden courage? Just what is pressing up against his back and putting that kind of steel in his spine? Within minutes [Ford] will find out that putting the steel in the defendant's spine is the gun metal of a .40 caliber Glock pressing against the defendant's hip. That hidden source of his false courage and bravado is there, right there in his waistband. Now, one is always right to stand up to intimidation, whether in a bar, on a street, in a parking lot, in your own home, but not with reckless arrogance, not with false bravado, not with hollow courage born of the knowledge that there is a secret lethal weapon concealed on your hip."

In the fifth challenged comment, the prosecutor stated: "Then, he kind of moves back and back and forth; at that point, the defendant recklessly grabs a bottle, hurls it at [Ford] and charges across that front counter into that far corner of the bodega, and the fight starts. Starting a fight that he can't win, that he knew he couldn't win from the beginning, with a gun on his hip. That is a reckless loss of temper by an armed man."

The two comments regarding the defendant's alleged failure to take other reasonable measures are as follows. The prosecutor first stated: "As this event progresses, foolishly [Ford] invites the defendant outside to fight. And, I think, as you watch that [surveillance] tape, you can see [Ford] walk out and then stay out and then walk back in. Why is it that the defendant does not take up that invitation? Now, that is not out of an excess of peaceableness. Common sense should suggest that he knows it is a fight he cannot win. Foolishly, he does not do at that point what any one of us would have reasonably done, what any person would have reasonably done, which is when [Ford] was outside, when he walked out that door, he would have turned to the owner and [said], call the cops."

knowledge that the trial court judge would not give an instruction on any of the statutory disqualifications to the right of self-defense." At the same time, it is undisputed that the court, in summarizing two earlier charging conferences, stated: "I will not give an instruction [to the jury] on any of the so-called statutory disqualifications to the right of self-defense, including provocation. Counsel can argue whatever the evidence is. I will just simply not instruct on that." The prosecutor, thus, was free to so argue during closing argument. That the defendant provoked Ford at the grocery store and declined to take steps other than shooting Ford are inferences the jury reasonably could draw from the evidence presented. On our review of the challenged comments, we agree with the state's contention that "the prosecutor's comments simply asked the jury to consider the entirety of the defendant's actions, and the fact that other alternatives existed to shooting [Ford], during [its] determination as to whether the defendant's actions were reasonable." The comments do not amount to prosecutorial impropriety.

## II

The defendant also claims this court should exercise its supervisory powers and set aside his conviction due

---

The prosecutor next stated: "The next test, the third one, was that he honestly had to believe that taking the shot was the only way to repel the attack, which threatened great bodily harm. Obviously, if you don't believe the first two, you don't believe that the response is credible, believable. But even if you had an honest belief that pulling that gun was necessary, he didn't have to shoot; he didn't have to pull the trigger. All he had to do was back him off and slip out the door. Or if he didn't feel safe about slipping out the door, all he had to do was back him off with the gun and wait for the police to arrive. If this case shows anything, the police are all over Stillwater Avenue. There is that expression: there is never a cop around when you need one. I think that this case has answered any question, that is answerable, that is because they are all over on Stillwater Avenue. I mean, there was a policeman across the street when he went to go get him over the pool table dispute. And the police officers are in that bodega within minutes. All he had to do was back him off. The man is backing off, anyway. Remember, the critical moment is when he pulls the trigger."

to deliberate prosecutorial impropriety. We decline that request.

"[I]n considering claims of prosecutorial misconduct, we apply a due process analysis and consider whether the defendant was deprived of a fair trial. . . . A different standard is applied, however, when the claim involves deliberate prosecutorial misconduct during trial which violates express court rulings . . . . When such an allegation has been made, we must determine whether the challenged argument was unduly offensive to the maintenance of a sound judicial process. . . . If we answer that question in the affirmative, we may invoke our supervisory powers to reverse the defendant's conviction. . . . In determining whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark was to undermine the authority of the trial court's ruling . . . . We also consider the degree of prejudice suffered by the defendant as a result of the remark. . . .

"Our Supreme Court . . . has urged a cautionary approach in this regard, noting that [r]eversal of a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct. . . .

"In *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983), our Supreme Court first enunciated the principles relevant to claims of deliberate prosecutorial impropriety in violation of a trial court's ruling. Our Supreme Court held that, where such impropriety has

occurred, an appellate court may exercise its inherent supervisory authority over the administration of justice to defend the integrity of the judicial system. . . . The court blatantly rejected the argument that it could upset a criminal conviction on account of prosecutorial impropriety only where such conduct had deprived the defendant of his constitutional right to a fair trial. . . . Instead, the court recognized that, given the proper circumstances and regardless of whether deliberate impropriety deprived a defendant of a fair trial, the drastic step of upsetting a criminal conviction might be necessary to deter conduct undermining the integrity of the judicial system. . . . Thus, after weighing relevant considerations, the court placed a primacy upon its responsibility for the enforcement of court rules in pros-ecutorial [impropriety] cases and for preventing assaults on the integrity of the tribunal. . . . The court reasoned that it had an obligation to deter purposeful impropriety and concluded that reversal in cases involv-ing such deliberate conduct may be warranted even where a new trial is not constitutionally mandated. . . . Hence, the touchstone of our analysis in a claim of this nature is not the fairness of the trial but the existence of misconduct that deliberately circumvents trial court rulings." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 296–98, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010).

The defendant maintains that the prosecutor engaged in impropriety by deliberately circumventing the court's ruling that it would not instruct the jury on the statutory disqualifications to self-defense. We disagree. As earlier noted, the court did not forbid counsel from arguing such points; it simply indicated that it would not be so instructing the jury. The court stated: "I will not give an instruction [to the jury] on any of the so-called statutory disqualifications to the right of self-defense, including

provocation. Counsel can argue whatever the evidence is. I will just simply not instruct on that." Accordingly, it cannot be said that the prosecutor defied an order of the court. To the contrary, the prosecutor argued in accordance with the declaration of the court. We thus decline to exercise our supervisory powers in this instance.

### III

The defendant's final claim alleges instructional error. He maintains that the court's failure sua sponte to provide an instruction on the duty to retreat was improper. The defendant failed to preserve this claim at trial and seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. *Golding*'s first two prongs relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review. *State* v. *Jarrett*, 82 Conn. App. 489, 492 n.1, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004). We afford review because the record is adequate for review and the claim is of constitutional dimension. See *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994) (improper instruction on defense, like improper instruction on element of offense, is of constitutional dimension). We nevertheless conclude that the claim fails to satisfy *Golding*'s third prong.[2]

---

[2] The state has suggested that the defendant, by virtue of his failure to object in any manner to the court's instructions, waived this claim. It is true

We begin our analysis by observing that "the [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . A defendant who asserts a recognized legal defense, the availability of which is supported by the evidence, is entitled as a matter of law to a theory of defense instruction." (Citations omitted; internal quotation marks omitted.) *State* v. *Bryant*, 233 Conn. 1, 8–9, 658 A.2d 89 (1995). It is undisputed that the court in the present case provided a detailed instruction on self-defense, the substance of which the defendant does not challenge in this appeal.

that the defendant acquiesced to the charge as given at trial. At the same time, our Supreme Court has held that a defendant waives an unpreserved challenge to a jury instruction only when the record indicates "that the defendant actively induced the trial court to give the [improper] instruction that he now challenges on appeal . . . ." *State* v. *Ebron*, 292 Conn. 656, 682, 975 A.2d 17 (2009). The record is bereft of any evidence of active inducement on the part of the defendant.

In its appellate brief, the state suggests that "since it could only inure to the defendant's benefit for the court to refuse to instruct on such statutory exceptions to the right to self-defense, it strains credulity to believe that the state would have advocated against the giving of such an instruction. As such, the rational conclusion is that the defendant advocated for the court to refrain from instructing on the statutory exceptions and that he induced any claimed error as to the trial court's failure to provide an instruction which the defendant advocated against at trial." While that may be the case, no record of the charging conferences is before us, and we will not resort to speculation and conjecture, which "have no place in appellate review." *Narumanchi* v. *DeStefano*, 89 Conn. App. 807, 815, 875 A.2d 71 (2005).

Rather, the defendant claims that the court improperly failed sua sponte to instruct the jury on the duty to retreat exception to that defense. See General Statutes § 53a-19 (b);[3] see also *State* v. *Diggs*, 219 Conn. 295, 301, 592 A.2d 949 (1991) (referring to duty to retreat as one of "statutory exceptions" to defense of self-defense). Following the close of evidence, the court held two charging conferences with the parties. In summarizing those conferences on the record, the court stated: "I will not give an instruction [to the jury] on any of the so-called statutory disqualifications to the right of self-defense, including provocation. Counsel can argue whatever the evidence is. I will just simply not instruct on that." The defendant voiced no objection to the propriety of that initial ruling at trial or on appeal. Instead, he contends that because the prosecutor during closing argument argued to the jury that "the defendant ignored a duty to retreat," an instruction on that exception was necessary. Had the prosecutor advanced that theory, the defendant would be correct. As our Supreme Court stated in *State* v. *Lemoine*, 256 Conn. 193, 770 A.2d 491 (2001), "had the state's attack on the defendant's self-defense claim been based on the defendant's failure to retreat, a complete jury instruction on the duty to retreat would have been necessary." Id., 200. Because the state in that case "made no claim that the

---

[3] General Statutes § 53a-19 (b) provides: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he or she is a peace officer or a special policeman appointed under section 29-18b, a Department of Motor Vehicles inspector appointed under section 14-8 and certified pursuant to section 7-294d, or a private person assisting such peace officer, special policeman or motor vehicle inspector at his or her direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he or she abstain from performing an act which he or she is not obliged to perform."

defendant should have retreated," the court concluded that "the defendant did not suffer constitutional harm by the trial court's omission of an unnecessary and potentially confusing instruction on the duty to retreat." Id.

Similarly, the prosecutor in the present case never referenced the defendant's duty to retreat or § 53a-19 (b) during closing argument. To be sure, the prosecutor argued that the defendant failed to take other reasonable measures short of shooting Ford, stating that the defendant could have asked the grocery store owner to "call the cops," could have attempted to "back [Ford] off and slip out the door" or simply could have "back[ed] him off with the gun and wait for the police to arrive. . . . All he had to do was back him off." Those comments advanced the state's central theory that the defendant's action in shooting Ford was unreasonable. At the same time, the prosecutor never argued to the jury that the defendant had an obligation to retreat under Connecticut law, nor did he once use the term "retreat" during closing argument. On our review of the record, we cannot agree with the defendant's contention that the prosecutor advanced such a theory during closing argument. As such, his claim is controlled by State v. Lemoine, supra, 256 Conn. 200. Having failed to establish that the alleged constitutional violation clearly exists, it fails to satisfy Golding's third prong.

The judgment is affirmed.

In this opinion the other judges concurred.