STATE OF CONNECTICUT *v.* JOHN INGRAM
(AC 31396)

Beach, Alvord and Borden, Js.

Argued September 14—officially released December 6, 2011

*Annacarina Jacob*, senior assistant public defender, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Edward Narus*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, John Ingram, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3).[1] The defendant claims that (1) there was insufficient evidence to sustain his conviction, (2) the court erroneously admitted dog scout and dog bite evidence without a proper foundation, (3) the court erred by failing to instruct the jury regarding dog tracking evidence and (4) prosecutorial impropriety deprived him of a fair trial. We affirm the judgment of the trial court.

---

[1] The defendant was also charged with kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), but was found not guilty on that charge.

The jury reasonably could have found the following facts. On the evening of August 3, 2007, the defendant left Houlihan's in Glastonbury, a restaurant where he was employed as a fry cook, at approximately 5 p.m. He was wearing dark clothing and was carrying a red backpack. At approximately 10 p.m., Zaka Uddin, who had been working alone at the Getty Mart at 611 Main Street in East Hartford, closed the Getty Mart and went to his car. As he began to enter his car, the defendant, who was wearing black clothing and a black nylon mask, grabbed Uddin by the neck and pushed Uddin into his car. The defendant held a large knife to Uddin's throat, threatened to kill him and demanded money. In attempting to push the knife away from his throat, Uddin cut his fingers. After Uddin gave the defendant his wallet, which contained approximately $54, the defendant demanded more money. Uddin explained that he was not the owner of the Getty Mart and that he did not have additional money. The defendant demanded Uddin open the trunk of his car, and, after Uddin complied, the defendant put Uddin in the trunk of the car and closed the trunk. Uddin was able to open the trunk and went into the Getty Mart to dial 911.

Once the police arrived, Uddin provided the officers with a description of the perpetrator. Among other observations, Uddin said the perpetrator was carrying a large knife with a black handle and was wearing dark clothing, a mask and a backpack. The police found a nylon cap behind the Getty Mart, and Uddin identified it as the one worn by the perpetrator. After hearing a radio transmission describing the perpetrator, James O'Connor, an officer with the East Hartford police department, saw a man dressed in dark clothing and carrying a red backpack walk behind Kahoots bar. The man began "weaving in and out of" vehicles in the Kahoots parking lot and crossed Main Street. O'Connor drove his car over the median onto Main Street, got out

of his car and requested the man to stop. The man dropped the backpack and ran. O'Connor and another officer chased after him. The man climbed a metal fence and disappeared into a wooded area. O'Connor did not climb over the fence because he knew that Todd Mona, a police officer with the East Hartford police department, and his police K-9, Primo, were responding and O'Connor did not want to "disturb the scent."

Shortly thereafter Mona and Primo arrived on the scene. After determining that it was an "ideal situation" for a "scout,"[2] Mona gave the perpetrator three verbal announcements to "surrender or I'll send in the dog, and you will be bit." After hearing no response, Mona and another officer lifted Primo over the fence. Primo had been trained, in situations such as this, to use his nose to find the person and either to bite or if Primo could not reach the person, to bark. After giving Primo several minutes to work, Mona and other officers scaled the fence and searched for Primo and/or the suspect. After approximately twenty minutes, Mona yelled "Primo, come" several times, and Primo returned to the area of the fence where he began the scout. Based on Primo's behavior, Mona was "[v]ery confident" that Primo had located and bitten the perpetrator, as commanded.

John Dupont, an officer with the East Hartford police department, was on patrol in the Main Street area when he received a radio transmission describing the Getty Mart robbery and the suspect. Dupont proceeded down Main Street, passed a highway exit ramp, parked his car and waited. Dupont noticed the defendant walking eastbound on the highway. The defendant was shirtless and was wearing light colored pants and socks but no shoes. He appeared "physically drained," his pants and

---

[2] Mona testified that in a "scout," a dog is sent, on his own without a leash, to follow a specific scent.

socks were muddy and his ankle was bleeding. After the defendant removed his sock, Dupont noticed puncture wounds on the defendant's ankle that appeared to be a dog bite. When Dupont asked the defendant how he obtained the dog bite, the defendant replied that it was not a dog bite, but, rather, he had been stabbed. The defendant received treatment for his ankle wound later that evening at a nearby hospital.

The nylon cap and several items from the discarded red backpack were submitted to a state laboratory for analysis. A DNA sample taken from the knife, which was found in the backpack, was consistent with the victim's DNA, but no DNA that was consistent with the defendant's was found on the knife. A DNA sample retrieved from a Houlihan's baseball cap, which was also found in the backpack, was consistent with that of the defendant. A DNA sample that was taken from the nylon stocking, which Uddin identified as the one worn by the perpetrator at the time of the robbery, was consistent with that of the defendant.

The defendant was arrested and charged with, inter alia, robbery in the first degree. Following a jury trial, the defendant was found guilty of robbery in the first degree and sentenced to twenty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal because his robbery conviction was based on insufficient evidence. He argues that there was insufficient evidence to prove beyond a reasonable doubt that he was the perpetrator of the robbery. We are not persuaded.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two

part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002).

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Butler*, 296 Conn. 62, 77, 993 A.2d 970 (2010).

The evidence was sufficient to establish the defendant's identity as the perpetrator of the robbery.[3] Uddin said that the perpetrator carried a backpack, wore dark clothing and sported a black nylon cap over his face as a mask. On the evening in question, when the defendant left Houlihan's, he was wearing black pants and carrying a red backpack. The defendant points to the fact that the perpetrator was wearing dark clothing during the commission of the robbery and the defendant was wearing light colored pants when Dupont found

[3] Our "sufficiency review does not require initial consideration of the merits of [the defendant's evidentiary claims] . . . . Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims of evidentiary error." (Internal quotation marks omitted.) *State* v. *Coyne*, 118 Conn. App. 818, 826, 985 A.2d 1091 (2010).

him on the highway. He argues that there was no evidence that he removed his dark clothes in the woods. Although the police did not find dark clothes in the woods,[4] there was evidence that, in order to protect themselves from burns, some fry cooks at Houlihan's customarily wore a second set of pants under their standard uniform black pants. The jury reasonably could have determined that the defendant was wearing two sets of pants and removed or otherwise lost his black pants as well as his shoes and shirt while running through the woods. Further, Uddin could have been mistaken as to the color of the pants. In any event, a possible discrepancy in the evidence does not necessarily outweigh the evidence tending to show guilt.

Further, the police located a black nylon cap near the Getty Mart, which Uddin identified as that worn by the perpetrator. A DNA sample taken from the cap was consistent with that of the defendant. The defendant argues, however, that the cap contained a mixture of DNA. That does not negate the fact that DNA consistent with the defendant's was found on the cap. Additionally, the police found the red backpack that had also been discarded by the perpetrator. The defendant was seen leaving Houlihan's on the night in question carrying a red backpack, and the backpack discarded by the perpetrator contained, inter alia, the following items: a kitchen knife, recipes from Houlihan's restaurant, a "Houlihan's baseball style cap," a meat thermometer, a chef's jacket in the defendant's size that was the same kind that Houlihan's required as part of its cooks' uniforms, and a black permanent marker similar to the type that cooks frequently bring to work to label the expiration date on food. A DNA sample taken from the Houlihan's baseball cap was consistent with the defendant's DNA. Although, as the defendant argues,

---

[4] Police officers discontinued their search in the woods for the dark clothing when they stepped on an "underground wasps nest."

neither the defendant's DNA nor his fingerprints were found on the knife, the victim's DNA was found on the knife.

In further support of his claim, the defendant argues that his wounded ankle could not be the basis for a reasonable inference that he was the perpetrator, because no expert identified the wound as a bite by Primo. The jury, however, reasonably could have inferred that the wound was a dog bite by Primo. Mona testified that although he did not see Primo bite the perpetrator, he was "[v]ery confident" that Primo located and bit the perpetrator as commanded. Because of Primo's "excessive breathing," "body language" and by the fact that Primo returned to Mona, he "knew" that Primo had completed the task that Primo was commanded to do.

Additionally, upon locating the defendant, Dupont observed that the defendant's left ankle was bleeding through his sock, and after the defendant removed his sock, Dupont observed what "looked like a dog bite" on the defendant's ankle. When Dupont asked the defendant how he obtained a dog bite, the defendant replied that it was not a dog bite but that he had been stabbed. Dupont then asked if he was stabbed by a hook knife. The defendant laughed and replied that he had been stabbed by a hook knife when "two drunk guys" attempted to rob him earlier that evening by the library. When asked "basic questions" about his explanation of the wound, the defendant was "deceptive." Dupont testified that he was familiar with dog bites through his work as a police officer and as a paramedic and that the defendant's injury was consistent with a dog bite and inconsistent with a hook knife wound.

Furthermore, after the defendant was transported to a nearby hospital, Michael Iozzo, a board certified physician's assistant, treated the defendant for a dog

bite injury. The defendant argues that Iozzo admitted that the injury could have been caused by a knife. Although Iozzo admitted as much, he treated the wound as a dog bite, and Dupont testified that the wound appeared to him to be a dog bite.

Although, as the defendant argues, no expert testimony was presented on the question of whether the configuration of the teeth marks on the defendant's ankle matched Primo's dentation, the jury reasonably could have concluded that the defendant was bitten by Primo based on Mona's testimony that he was confident that Primo had completed the task and Dupont's testimony that the defendant was found walking on the highway near the wooded area and that he had a dog bite on his ankle. The aggregation of evidence, including the persuasive DNA evidence and the connection to Houlihan's, was more than sufficient for the jury to reasonably conclude that the defendant was the perpetrator of the robbery. See, e.g., *State* v. *Testa*, 123 Conn. App. 764, 769, 3 A.3d 142 (although victim unable to identify defendant as perpetrator and no fingerprints were recovered from stolen items, evidence as whole supported jury's finding of defendant's identity as perpetrator), cert. denied, 298 Conn. 934, 10 A.3d 518 (2010).

II

The defendant next claims that the court erroneously admitted dog "scouting" and dog bite evidence without a proper foundation. We disagree.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Because a

trial court's ruling under *Porter*[5] involves the admissibil-
ity of evidence, we review that ruling on appeal for an
abuse of discretion." (Citation omitted; internal quota-
tion marks omitted.) *State* v. *Sorabella*, 277 Conn. 155,
214, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct.
131, 166 L. Ed. 2d 36 (2006).

The following additional facts are relevant. Prior to
trial, the defendant filed a motion in limine to exclude
dog scouting and dog bite evidence on the ground that
such evidence was overly subjective and not based on
a reliable scientific methodology. The court conducted
a preliminary hearing to determine whether a *Porter*
hearing was necessary. The court found credible the
testimony of Mona, Primo's handler, and Iozzo, the phy-
sician's assistant who treated the defendant's ankle
wound, and determined that they qualified as expert
witnesses in the specific areas in which they were ten-
dered. The court further determined that the dog scout
and dog bite evidence was not evidence that required
scrutiny under *Porter* for scientific reliability. The court
determined that the state satisfied the four foundational
requirements set forth in *State* v. *Wilson*, 180 Conn.
481, 489, 429 A.2d 931 (1980), but reserved its decision
on the admissibility of the evidence until relevancy had
been established, that is, until the state showed a nexus
between the robbery at the Getty Mart and the
defendant.

During the testimony of O'Connor, the defendant
objected to a question by the state regarding the actions
of Mona and Primo on the ground of relevancy, arguing
that at that point in the trial, the state had not shown
a nexus between the defendant and the robbery. In
response, the state described the evidence it planned
to present to connect the defendant to the robbery,

---

[5] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523
U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

such as evidence linking the defendant's and victim's DNA to items in the red backpack, and evidence connecting the defendant's DNA to the nylon cap. The court found the dog scouting testimony and dog bite testimony of O'Connor, Mona and Iozzo to be relevant, subject to the state's presenting requisite foundational testimony.

A

The defendant argues that Mona's testimony relating to dog scouting should have been subject to a *Porter* analysis. We disagree.

"In [*Porter*], we adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]. We noted therein two requirements established under *Daubert*. First, [we noted] that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, [we noted that] the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . In *Porter* [our Supreme Court] recognized that *Daubert*'s vagueness as to how and when to apply the factors of the test was necessary. . . . In order to maintain flexibility in applying the test, [our Supreme Court] did not define what constitutes scientific evidence. . . . Consequently, our initial inquiry is

whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella*, supra, 277 Conn. 215.

The court found that it did not have to conduct a *Porter* hearing because dog scout evidence is not of a scientific nature. The court concluded that the reliability of such evidence is not usefully informed by scientific understanding of canine olfaction but, instead, turns on ensuring that the dog and its handler are properly trained and on ensuring that the perpetrator's scent trail can be tracked reliably. The court analyzed the admissibility of the dog scout evidence under *State* v. *Wilson*, supra, 180 Conn. 488–90, and determined that the evidence was admissible.

The court did not abuse its discretion in determining that a *Porter* analysis was not necessary. There is nothing scientifically novel about the use of police dogs to track criminal suspects; it is the type of evidence that readily may be understood and evaluated by a fact finder on the basis of common knowledge that dogs have an exceptional sense of smell.

The defendant argues that *Wilson* does not apply because that case involved dog tracking evidence and the present case involves dog scouting evidence. He argues that, because Primo was not tethered, Mona observed Primo only before and after the scout and not during the scout and, therefore, was not in a position to give an opinion as to whether Primo correctly tracked the suspect's scent.

The court did not abuse its discretion in applying the factors in *Wilson* to determine the admissibility of dog scout evidence. In *Wilson*, our Supreme Court concluded that dog tracking evidence is admissible to prove the identity of the accused in a criminal prosecution provided that the party offering the evidence shows

that: "(1) the handler was qualified to use the dog; (2) the dog was trained and accurate in tracking humans; (3) the dog was placed on the trail where circumstances indicate the alleged guilty party to have been; and, (4) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow it." (Internal quotation marks omitted.) Id., 489; see also *State* v. *St. John*, 282 Conn. 260, 271, 919 A.2d 452 (2007) (trial court did not abuse its discretion in permitting witness to testify as expert concerning dog tracking evidence because state satisfied *Wilson*).

Although *Wilson* and its progeny, *St. John*, both involve dog tracking evidence, and the present case involves dog scouting evidence, dog tracking and dog scouting are similar enough so that the *Wilson* factors properly apply in the present case. Mona testified as to the similarities and differences between dog tracking and dog scouting evidence. He testified that in dog tracking, a dog that is trained to track specific scents is targeted to a scent. For example, if someone runs from a car, the dog can be targeted to track the scent left on the seat. For the safety of the dog, the dog is tethered on a fifteen foot leash, and the handler follows along as the dog follows the scent. Mona differentiated a "scout": "If a person were to run into the woods . . . [y]ou give your announcements, the dog runs around and will locate the person who is out in those woods by using his nose . . . ." On a scout, a "dog is sent out on a task on his own without a leash and sent to do a job." The dog can pick up the scent of a person from an environment where the person recently was located, and then follow the scent on his own. The absence of a tether in dog scout evidence does not remove it from the ambit of *Wilson*. The reliability of dog scout evidence logically relies on the training and experience of the dog and its handler and the freshness and lack of

undue contamination on the trail. The principles underlying dog scouting are the same as those underlying dog tracking; dog scouting, then, is not more subject to scrutiny under *Porter* than dog tracking.

## B

The defendant alternatively argues that the court erred in determining that the state had met the second and fourth prongs of *Wilson*. We disagree.

The defendant argues that the state failed to meet the second prong of *Wilson*—that Primo was trained and accurate in tracking humans—because Mona testified that the scout at issue was Primo's first outside scout, and, therefore, the state failed to establish an accuracy rate for scouting. The fact that this was Primo's first outside scout does not pertain to admissibility but, rather, to the weight of the evidence. The second prong of *Wilson* "merely requires evidence that the dog was trained and accurate in tracking humans." *State* v. *John*, supra, 282 Conn. 272. Mona's testimony demonstrated that Primo was trained in and was accurate in scouting. He and Primo participated in a sixteen week program for forty hours per week at a state police training facility. During the program, Mona and Primo received training in, inter alia, scouting, and during training, Primo never failed to participate in or to succeed in a scout.[6] Mona and Primo both passed the training and were certified. This testimony alone satisfies the second prong. See id.

The defendant argues that the state failed to meet the fourth prong of *Wilson*—that the trail had not become so stale or contaminated as to be beyond Primo's competency to follow it—because the state offered no evidence that the trail had not become contaminated. He argues that because Primo was not tethered, Mona was unable to observe Primo's behavior on

---

[6] Primo graduated "in the top two" of his class of eighteen.

the scout; Primo may have been distracted by other scents, and, therefore, the fourth prong could not be satisfied. Mona testified that the perpetrator recently had jumped over a fence and the only human scents in the area of the fence to which Primo was targeted were those of O'Connor and the perpetrator. Mona observed that the area into which the perpetrator fled was wooded and free of contamination from other humans and determined that it was an ideal situation for a scout. Based on Mona's testimony, the court reasonably could have concluded that the fourth prong of *Wilson* had been satisfied. We stress, again, that the *Wilson* factors are designed to serve a gatekeeping function, and the finder of fact can accord the evidence whatever weight it finds warranted.

## C

The defendant also seems to argue that the court erred in admitting dog bite testimony from Mona, Dupont and Iozzo because they were not qualified as scientific or medical experts in dog bite identification under § 7-2 of the Connecticut Code of Evidence.[7] He contends that the state presented no evidence that Primo was the source of the defendant's wound, but the effect of Mona's, Dupont's and Iozzo's testimony amounted to identification evidence. As a result, he contends, the jury was misled to infer that Primo was the source of the defendant's wound and that, therefore, the defendant was the robbery suspect. We do not agree.

"The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of

---

[7] The defendant does not challenge the court's ruling that a *Porter* analysis is not applicable but, rather, argues that the court erred in allowing the state to offer dog bite evidence.

the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citation omitted; internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 550, 757 A.2d 482 (2000); see also Conn. Code Evid. § 7-2.

With respect to dog bite evidence, the witnesses at issue testified as follows. Mona testified that, based on his training and experience, he was confident that Primo had located and bitten the perpetrator as commanded. Dupont, a police officer who had been an emergency medical technician for approximately fifteen years and a paramedic for ten years, testified that he observed puncture wounds on the defendant's ankle that "look[ed] like a dog bite." Iozzo, a board certified physician's assistant, testified that the triage nurse, who evaluated the defendant when he arrived at the hospital, noted in a report that the defendant presented with what appeared to be a dog bite but that the defendant stated that he had been stabbed. Iozzo testified that his diagnosis was a puncture wound laceration. He observed multiple puncture wounds to the defendant's left ankle and two small lacerations on the inside and outside of the ankle. He also testified that, in general, dog bites appear near the lower leg and ankle while stab wounds typically appear on the torso and upper extremities. He noted that dog bites typically are not as deep as stab wounds and that he treated the defendant's wound with a skin closure method typically used for relatively superficial wounds. He further noted that he typically does not give antibiotics for dog wounds and that he treated the wound as a dog bite and did not give antibiotics to the defendant. He stated that the wound was consistent with both a knife wound and a dog bite.

The court did not abuse its discretion in admitting the foregoing dog bite testimony. Mona, Dupont and Iozzo all had training and experience related to the matters about which they testified. The court could reasonably have determined that their testimony was not within the common knowledge of the jury and therefore would be helpful to the jury in considering the issues. Neither Mona, Dupont nor Iozzo testified that the bite mark on the defendant's ankle came from Primo, testimony for which possibly additional training and experience would be required. Mona, however, testified as to the success of the scout based on cues he witnessed from Primo, and Dupont and Iozzo, based on their training and experience, described the wound they observed. Although the evidence was circumstantial, it was relevant, as it tended to prove identity. It was not necessary, for purposes of admissibility, to offer expert testimony matching the bite marks on the defendant's ankle with Primo's teeth.

### III

The defendant next claims that the court erroneously failed to instruct the jury "in accordance with his request for a cautionary instruction regarding dog tracking evidence." We disagree.

"[A] request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. A refusal to charge in the exact words of a request [however] will not constitute error if the requested charge is given in substance. . . . [W]hen reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort

but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 234–35, 733 A.2d 156 (1999).

The defendant filed a written request to charge regarding "evidence of dog tracking and/or scouting" in which he requested the following instruction: "You have heard evidence of dog tracking and/or scouting in this matter from Officer Mona. Dog tracking evidence must be viewed with the utmost caution. Such evidence is of slight probative value. Such evidence must be considered, if found reliable, not separately but in conjunction with all the other testimony in the case. Such evidence in the absence of some other direct evidence of guilt would not warrant a conviction. While such evidence is evidence which may be considered by you in your deliberations, it is not in and of itself evidence that a crime was actually committed."

In its final instructions to the jury, the court instructed the jury as follows regarding dog scouting evidence: "You have heard testimony on the use of a police dog in this case. The testimony was offered primarily by Officer Mona. In evaluating this evidence and determining its reliability, if you can, you are to consider: (1) the qualifications of the handler to use the dog; (2) whether the dog was trained and accurate in the tracking of humans; (3) whether the dog was placed on the trail where certain circumstances indicate the alleged guilty party to have been; and (4) whether the trail had become so stale or contaminated as to be beyond the dog's competency to follow it. Such evidence must be considered by you if found reliable in conjunction with other testimony in the case. While

such evidence is evidence which may be considered by you in your deliberations, it is not in and of itself evidence that a crime was actually committed. It must be considered by you in conjunction with other evidence. The weight to be given to this testimony is for you as jurors to determine."

The court gave the substance of the request, except it omitted the language suggesting that the evidence was highly suspect. The defendant acknowledges that there is no Connecticut authority on point holding that the defendant is entitled to a dog tracking/scouting instruction if requested. We know of no binding authority requiring an instruction that the evidence be regarded with utmost caution. At least in the context of this case, where a great deal of other evidence implicated the defendant, such a charge was not necessary.

## IV

The defendant last claims that prosecutorial impropriety during the state's closing and rebuttal arguments deprived him of a fair trial. We disagree.

"We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Citations omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted.) *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002).

The defendant argues that the prosecutor committed impropriety when he directed the jury to speculate on facts not in evidence. First, the defendant argues that the prosecutor improperly discussed the white sneakers found in the red backpack even though the jury heard no evidence that the sneakers belonged to the defendant. When discussing the contents of the red backpack, the prosecutor commented that "[t]here's some white shoes you could change into when you leave work because you can't wear those there" and "again, where are the dark nonskid shoes that he's wearing when he leaves work? Okay. He's got nice clean ones in the bag, but those aren't the kind that you can wear there." These comments were not improper but, rather, were based on inferences from evidence admitted at trial. "[A] prosecutor is permitted to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ." (Internal quotation marks omitted.) *State* v. *Moore*, 293 Conn. 781, 815, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010). The jury heard evidence linking the defendant to items in the red backpack. The defendant was seen leaving work carrying a red backpack, and the backpack contained multiple items that could be used by a fry cook, such as a Houlihan's cap that contained the defendant's DNA. The jury also heard evidence that while working at Houlihan's, the defendant was required to wear dark shoes as part of his uniform.

Second, the defendant takes issue with comments made by the prosecutor regarding the clothing that the defendant was wearing when apprehended. The prosecutor noted that when the defendant left work he was wearing dark shoes and dark pants, but when apprehended, he was wearing lightly colored pants. He remarked that the dark clothing was not in the backpack, and the jury could infer that the defendant did not change his clothes at home because he still had his backpack with items from work. The prosecutor noted that the evidence showed that fry cooks wear multiple layers of clothing and remarked that it could be inferred that the defendant was wearing dark clothes and dark shoes during the commission of the robbery but that he later disrobed. He remarked that when apprehended, the defendant was not wearing shoes and his pants were covered in mud. Due to the muddy conditions, the prosecutor suggested that the defendant's shoes were "sucked off his feet" as he ran through the woods.

The prosecutor's explanation for why the defendant left work wearing dark clothes but was apprehended wearing light pants and no shoes was based on inferences from the evidence. The jury heard evidence that some fry cooks at Houlihan's would wear a second set of pants under their standard uniform black pants to protect them from burns. The prosecutor's statements that the jury could infer that the defendant had taken off his dark clothes while in the woods to reveal the lighter clothes he donned when apprehended is an inference based on that evidence. There was also evidence that when apprehended, the defendant appeared physically drained and that his pants and socks were wet and covered in mud, leaves and grass. The prosecutor's comments regarding the loss of the defendant's shoes in the woods was an inference based on facts in evidence.

The defendant next argues that the prosecutor improperly commented on the defendant's motive to

commit the robbery. In the comments at issue, the prosecutor remarked: "His check didn't come that Friday. Remember? He got paid every Friday. He didn't get one that Friday. That was when they went into the two week plan. He's not going to get it for another week. So that's a motive to commit that robbery to get money that he wouldn't have for at least another week. He didn't get money for the previous week." Jeffrey Forlastro, the general manager of Houlihan's, testified that Houlihan's had paid its employees weekly but that a change of policy had been implemented wherein employees would be paid biweekly. Forlastro stated that August 3, 2007, was the first Friday that an employee would not receive a paycheck and that an employee would not receive a paycheck until the following Friday. Accordingly, the prosecutor's suggestion regarding the defendant's motive to commit the robbery was based on facts in evidence.

The defendant last argues that the prosecutor improperly injected personal opinion regarding the defendant's truthfulness. The prosecutor remarked that when apprehended, the defendant, shirtless and shoeless, was walking on the highway. The prosecutor noted that the defendant commented that he was "going home" to 22 Colt Street but that the defendant was walking in the opposite direction of Colt Street. The prosecutor remarked: "I suggest the defendant was not being truthful saying he's going home."

The prosecutor also noted that the defendant stated that he was attacked at the library. He questioned why the defendant would run into the woods after the alleged attack and why he would tell the police that he was going to Colt Street when he never lived on Colt Street. The prosecutor remarked: "It makes no sense. It's not truthful. His story is not truthful."

"[A] prosecutor is . . . not permitted to vouch personally for the truth or veracity of . . . witnesses. . . .

Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Dawes*, 122 Conn. App. 303, 311–12, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010).

The prosecutor's comments, however, were based on evidence admitted at trial and reflect an effort by the prosecutor to invite the jury to draw a reasonable inference that the defendant's version of events that he was "going home" to Colt Street when he was found clad in mud covered pants and socks walking on a highway in the opposite direction lacked credibility. See id.; see also *State* v. *Luster*, 279 Conn. 414, 438, 902 A.2d 636 (2006) (when comment based on reasonable inference from evidence prosecutor may properly comment on witness' credibility). Although the prosecutor used the pronoun "I," his comments clearly related to the strength of the evidence, rather than his personal belief as to the defendant's credibility. See *State* v. *Moody*, 77 Conn. App. 197, 217, 822 A.2d 990 (use of pronoun "I" in argument increases chances that arguments will deteriorate into expressions of personal opinion, but mere use of the pronoun "I" does not constitute improper argument), cert. denied, 264 Conn. 918, 827 A.2d 707, cert. denied, 540 U.S. 1058, 124 S. Ct. 831, 157 L. Ed. 2d 714 (2003).

The judgment is affirmed.

In this opinion the other judges concurred.